In re: OIL SPILL BY THE OIL RIG "DEEPWATER HORIZON" IN the GULF OF MEXICO, ON APRIL 20, 2010.

Applies to: 10–4536.

MDL No. 2179.

United States District Court, E.D. Louisiana.

Feb. 22, 2012.

## ORDER AND REASONS

[As to the United States', Transocean's, and Anadarko's Cross–Motions for Partial Summary Judgment Regarding Liability under the CWA and OPA]

CARL BARBIER, District Judge.

Before the Court are three cross-motions for partial summary judgment regarding the liability of BP Exploration and Production, Inc. ("BP"), Anadarko Petroleum Corporation ("Anadarko"), Anadarko E & P Company LP ("Anadarko E & P"), and the Transocean entities[1] ("Transocean") (sometimes collectively referred to as "Defendants") under the Oil Pollution Act of 1990 ("OPA") and the Clean Water Act[2] ("CWA"). (Rec. Docs. 4836, 5103, 5113).[3]

## I. BACKGROUND

For purposes of the instant Motions, the following facts are not in dispute: At all relevant times, BP and Anadarko were co-lessees of Block 252, Mississippi Canyon ("MC 252"), on the Outer Continental Shelf. BP and Anadarko also co-owned the Macondo Well, an exploratory well on MC 252. At all relevant times, the DEEPWATER HORIZON, a mobile offshore drilling unit ("MODU"), was owned and operated by one or more of the Transocean entities. From February 2010 until April 2010, the DEEPWATER HORIZON was engaged in drilling activities on the

---

1. The Transocean entities are Transocean Deepwater Inc., Transocean Offshore Deepwater Drilling Inc., Transocean Holdings LLC, and Triton Asset Leasing GmbH.

2. The Clean Water Act is also known as the Federal Water Pollution Control Act.

3. Additional briefing related these Motions appears at Record Documents 5214 (U.S.), 5216 (U.S.), 5265 (B.P.), 5266 (B.P.), 5283 (B.P.), 5280 (Anadarko), 5300 (Transocean), and 5510 (Plaintiffs' Steering Committee as amicus curiae).

Macondo Well. On April 20, 2010, while the DEEPWATER HORIZON was preparing to temporarily abandon the well, a blowout of the Macondo Well occurred, resulting in explosions and fire on the DEEPWATER HORIZON. On April 22, 2010, the DEEPWATER HORIZON sank into the Gulf of Mexico, breaking the riser pipe that connected the MODU to the Macondo Well in the process. Oil flowed from the Macondo Well, up the wellbore, through the blowout preventer ("BOP") and remaining segment of riser pipe, and into the Gulf of Mexico, and continued to do so until July 15, 2010.[4] The BOP and riser are appurtenances of the DEEPWATER HORIZON.

Following these events, the United States instituted case number 10–4536, *United States v. BP Exploration & Prod. Inc., et al.,* which alleged two claims for relief. First, the Government asserted civil penalties against the Defendants[5] pursuant to Section 311(b)(7) of the CWA, 33 U.S.C. § 1321(b)(7). The second claim sought a declaratory judgment that the Defendants are liable to the United States under OPA for past and future removal costs and damages resulting from the discharge of oil.

The Government moved for partial summary judgment on the issues of liability under the CWA and OPA. (Rec. Doc. 4836). Each Defendant filed an opposition to the Government's Motion. (Rec. Docs. 5124, 5113, 5103). Additionally, the Anadarko entities cross-moved for partial summary judgment that they are not liable for CWA penalties as a matter of law. Transocean also cross-moved for partial summary judgment, urging that it is not liable under either OPA or the CWA with respect to the underwater discharge of oil.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir.1994). "A party asserting that a fact cannot be … genuinely disputed must support the assertion by … citing to particular parts of material in the record, including depositions, documents, … or other materials…." Fed.R.Civ.P. 56(c)(1). When assessing whether a dispute as to any material fact exists, the Court considers "all of the evidence in the record but refrains from making credibility determinations or weighing the evidence." *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.,* 530 F.3d 395, 398 (5th Cir.2008). All reasonable inferences are drawn in favor of the nonmoving party, but a party cannot defeat summary judgment with conclusory allegations or unsubstantiated assertions. *Little,* 37 F.3d at

---

**4.** There is a factual dispute as to whether any oil discharged on or above the surface of the water between the time of the blowout and when the riser broke. Transocean contends that any oil that traveled up the riser to the deck of the MODU during this time would have combusted in the fire before it could have entered the water. Because of this dispute, the Court does not address here any discharge that *may* have occurred on or above the surface of the water. Instead, this Order focuses only on the discharge that oc-

curred beneath the surface of the water after the riser was broken.

**5.** The United States' Complaint also named MOEX Offshore 2007 LLC and QBE Underwriting Ltd., Lloyd's Syndicate 1036 as defendants. However, the United States has not moved for summary judgment against these entities. (*See, e.g.,* USA Memo. in Supp. p. 26 n. 43, Rec. Doc. 4820–2 at 37 n. 43). These entities are irrelevant for present purposes.

1075. A court ultimately must be satisfied that "a reasonable jury could not return a verdict for the nonmoving party." *Delta,* 530 F.3d at 399.

If the dispositive issue is one that the moving party will bear the burden of proof at trial, the moving party "must come forward with evidence which would 'entitle it to a directed verdict if the evidence went uncontroverted at trial.'" *Int'l Shortstop, Inc. v. Rally's, Inc.,* 939 F.2d 1257, 1263–64 (5th Cir.1991) (citation omitted). The nonmoving party can then defeat the motion by either countering with sufficient evidence of its own, or "showing that the moving party's evidence is so sheer that it may not persuade the reasonable fact-finder to return a verdict in favor of the moving party." *Id.* at 1265. If the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden by merely pointing out that the evidence in the record is insufficient with respect to an essential element of the nonmoving party's claim. *See Celotex,* 477 U.S. at 325, 106 S.Ct. 2548. The burden then shifts to the nonmoving party, who must, by submitting or referring to evidence, set out specific facts showing that a genuine issue exists. *See id.* at 324, 106 S.Ct. 2548. The non-movant may not rest upon the pleadings, but must identify specific facts that establish a genuine issue for trial. *See, e.g., id.* at 325, 106 S.Ct. 2548; *Little,* 37 F.3d at 1075.

## III. DISCUSSION

### A. *Anadarko E & P*

On April 20, 2010, Anadarko E & P submitted an application to the Minerals Management Service (MMS) to reassign its 22.5% interest in the Macondo lease to Anadarko, which the MMS approved on April 28, 2010. The Anadarko entities argue that the assignment was retroactive to April 1, 2010. The Government initially argued that the assignment was not retroactive and that both Anadarko E & P and Anadarko were liable under OPA and the CWA. However, it appears the Government has receded from this position, although it is not entirely clear to what extent.[6] In light of this, the Court finds that the United States is not entitled to summary judgment as to Anadarko E & P. However, the Court does not determine at this time whether the assignment of the lease was legally retroactive, nor does it affirmatively determine that Anadarko E & P is not liable under the CWA or OPA. In this respect, the United States' Motion for Partial Summary Judgment is simply denied.

### B. *The Oil Pollution Act*

The Government argues that BP, Anadarko, and Transocean are jointly and severally liable under OPA for removal costs and damages, because oil discharged from *both* the Macondo Well, an offshore facility, and appurtenances (the BOP and riser segment) of the DEEPWATER HORIZON, a vessel. BP and Anadarko generally do not dispute their liability under OPA. Transocean, however, argues that it is not liable with respect to the discharge that occurred beneath the surface of the water, because only the lessees or permittees of the area are liable under OPA for such discharges.

Under OPA, "responsible parties" are strictly liable for removal costs and dam-

---

6. At oral argument, Anadarko's counsel stated that the Government conceded that the lease-holder issue does not relate to the issue of CWA liability, only OPA liability. (Transcript pp. 31–32 (Rec. Doc. 5338)). The Government did not refute this statement, and its

Reply brief tends to focus on Anadarko's ownership of the Macondo Well, not E & P's ownership. (*See* U.S. Reply, p. 9, Rec. Doc. 5214 at 17) ("Each defendant admits that it is an 'owner.' ... '*APC* [Anadarko] was a partial owner of the Macondo Well.'").

ages resulting from the discharge of oil.[7] This framework is generally established in Section 1002(a):

> Notwithstanding any other provision or rule of law, and subject to the provisions of this Act, each **responsible party** for a **vessel** or a **facility** from which oil is discharged ... into or upon the navigable waters or adjoining shorelines or the exclusive economic zone is liable for the removal costs and damages specified in subsection (b) of this section that result from such incident.

33 U.S.C. § 2702(a) (emphasis added). Who is a "responsible party," is set out in OPA's definition section, Section 1001:

> "responsible party" means the following: (A) Vessels.—In the case of a vessel, any person owning, operating, or demise chartering the vessel.
>
> . . .
>
> (C) Offshore facilities.—In the case of an offshore facility ..., the lessee or permittee of the area in which the facility is located....

33 U.S.C. § 2701(32). "Vessel," as that term is used in Sections 1001 and 1002(a), "means every description of watercraft or other artificial contrivance used, or capable of being used, as a means of transportation on water, other than a public vessel." 33 U.S.C. § 2701(37). " '[O]ffshore facility' means any facility of any kind located in, on, or under any of the navigable waters of the United States, ... other than a vessel or a public vessel." 33 U.S.C. § 2701(22). Furthermore, "facility," as that term is used to define "offshore facility" and in Section 1002(a), means "any structure, group of structures, equipment, or device (other than a vessel) which is used for one or more of the following purposes: exploring for, drilling for, producing, storing,

handling, transferring, processing, or transporting oil...." 33 U.S.C. § 2701(9). Thus, when oil discharges from a "vessel," the responsible party is the owner, operator, or demise charterer of the vessel (hereinafter, "owner/operator"). When oil discharges from an "offshore facility," the responsible party is the lessee or permittee of the area in which the facility is located (hereinafter, "lessee").

As the words "other than a vessel" in the definitions for "facility" and "offshore facility" indicate, vessels and offshore facilities typically are mutually exclusive categories. However, OPA provides a hybrid definition for MODUs: " 'mobile offshore drilling unit' means a vessel (other than a self-elevating lift vessel) **capable of use as an offshore facility.**" 33 U.S.C. § 2701(18) (emphasis added). In the MODU context, then, the responsible party is determined by how the MODU was used at the time of the incident (subject to the caveat created by Section 1004(b), discussed below). When the MODU is **not** being used as an offshore facility—such as when it is moving from one drilling location to another—the MODU is treated as a vessel and the responsible party is the owner/operator of the MODU (the responsible party for a vessel). When the MODU is being used as an offshore facility—i.e., when the MODU is "exploring for, drilling for, producing, [etc.] ... oil" "in, on, or under ... navigable waters"—then the responsible party is the lessee (the responsible party for an offshore facility).

Section 1004(b) creates an exception to this rule, however:

> (b) Division of liability for mobile offshore drilling units
>
> (1) Treated first as tank vessel
>
> **For purposes of determining the responsible party and applying this**

---

**7.** There are a few defenses to liability under OPA, none of which are at issue here. *See* 33 U.S.C. § 2703.

*Act* and except as provided in paragraph (2), a mobile offshore drilling unit which is *being used as an offshore facility is deemed to be a tank vessel* with respect to the discharge, or the substantial threat of a discharge, of oil *on or above the surface of the water.*

(2) Treated as facility for excess liability

To the extent that removal costs and damages from any incident described in paragraph (1) exceed the amount for which a responsible party is liable (as that amount may be limited under subsection (a)(1) of this section), the mobile offshore drilling unit is deemed to be an offshore facility. For purposes of applying subsection (a)(3), of this section, the amount specified in that subsection shall be reduced by the amount for which the responsible party is liable under paragraph (1).

33 U.S.C. § 2704(b) (emphasis added). Section 1004(b)(1) establishes that, even when the MODU is being used as an offshore facility, the owner/operator of the MODU will be the responsible party for a discharge that occurs on or above the surface of the water. In such a case, if liability exceeds the limits that would apply to a tank vessel, Section 1004(b)(2) provides that excess liability is borne by the lessee or permittee.

Thus, OPA's liability scheme for MODUs can be summarized as follows:

(1) If the MODU is being used as an offshore facility and the discharge occurs beneath the water's surface, then the responsible party is the lessee.

(2) If the MODU is being used as an offshore facility and the discharge occurs on or above the water's surface, then the responsible party is the owner/operator of the MODU up to the limits of liability that would apply for a tank vessel. Excess liability is borne by the lessee.

(3) If the MODU is *not* being used as an offshore facility, the responsible party for a discharge from the MODU is the owner/operator of the MODU.

Because of this liability allocation, the Court need not examine whether the discharge of oil was "from" the Macondo Well or an appurtenance of the MODU, or both. The MODU was being used as an offshore facility at the time of the discharge; therefore, with respect to the subsurface discharge, BP and Anadarko are responsible parties.

The Government argues that because Section 1004(b) only speaks to surface discharges, there is no reason the owner/operator of the MODU cannot be liable for a subsurface discharge. It argues that the purpose of Section 1004(b)(1) is merely to increase the liability of the owner/operator when a MODU is being used as an offshore facility, since it treats the MODU as a "tank vessel." The Government contends that, absent this provision, the MODU would be treated as a non-tank vessel, which has a lower limit of liability. *See* 33 U.S.C. 2704(a). However, if effect is to be given Section 1004(b)(1)'s phrase, "on or above the surface of the water," [8] then the Government's interpretation implies that when the MODU is being used as an offshore facility, the limit of liability for the owner/operator would change depending on whether the discharge occurred at the surface (tank vessel limit) or below (non-tank vessel limit). There is little sense in adjusting the owner/operator's limit of liability in this manner. Con-

---

**8.** "It is 'a cardinal principle of statutory construction' that 'a statute ought, upon the whole, to be construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.' " *TRW Inc. v. Andrews*, 534 U.S. 19, 31, 122 S.Ct. 441, 151 L.Ed.2d 339 (2001) (citations omitted).

trary to the Government's rationale, the reason Section 1004(b) only mentions surface discharges is because it was unnecessary for it to mention subsurface discharges. As discussed, the definitions in Section 1001 established a default rule that the responsible party would be the lessee when the MODU is being used as an offshore facility. Thus, in order to create an exception to this default rule, Congress only needed to state that exception. Stating who would be liable for a subsurface discharge would have been redundant.

Although the Court need not look outside the statutory language to reach its conclusion, it is worth noting that this interpretation is consistent with at least some commentators [9] and OPA's legislative history.[10] Moreover, using the water's surface as a means of apportioning liability in the MODU-as-offshore-facility context is logical, since a discharge occurring beneath the MODU is likely to be oil from the well. By contrast, oil that discharges at the water's surface might originate from the MODU (such as fuel oil stored on and used by the MODU [11]), or it might originate from the well (such as oil traveling the entire length of the riser and spilling over the MODU's deck). Thus, it is equally logical that OPA would first apportion liability to the MODU owner/operator for

---

**9.** *See* Antonio J. Rodriguez & Paul A.C. Jaffe, *The Oil Pollution Act of 1990*, 15 Tul. Mar. L.J. 1, 17 (1990) ("So, for a spill on or above the surface of the water, the owner or the operator of the MODU is the responsible party up to the limits of liability specified for a tank vessel. For oil discharged below the surface of the water, the offshore facility limits apply and the lessee or permittee is deemed the responsible party.")

**10.** The enacted version of OPA combined elements from House bill 1465 ("H.R. 1465")and Senate bill 686 ("S.686"). The Senate Report on S.686 was explicit about making the lessee liable for subsurface discharges: "Where a mobile offshore drilling unit is being used as an OCS facility, and there is a discharge of oil on or above the surface of the water, the owner or operator of the unit is liable, up to the limits established by the reported bill for tankers. If costs exceed that limit, the excess costs must be borne by the lessee or permittee. *If a discharge of oil from a mobile offshore drilling unit occurs below the surface of the water, the lessee or permittee is liable.*" S. Rep. No. 101–94, at 11 (1989), *reprinted in* 1990 U.S.C.C.A.N. 722, 733–34 (emphasis added). When Congress combined the House and Senate bills, the joint statement in the Conference Report explained the substantive differences between the bills, and made explicit when one choice was adopted and another rejected. *See, e.g.,* H.R. Rep. No. 101–653, at 7 (1990) (Conf. Rep.), *reprinted in* 1990 U.S.C.C.A.N. 779, 784 (explicitly rejecting the portion of the House bill that would have made the owner of oil cargo a responsible party). Although Congress ultimately adopted the House language regarding MODUs, the Conference Report does not indicate that there was any substantive difference between the Senate and House bills in this regard. *Id.*, 1990 U.S.C.C.A.N. at 785. In fact, the House Report on H.R. 1465 leads to the same interpretation discussed in the main text: " 'Mobile offshore drilling unit' (MODU) is defined as a vessel other than a self-elevating lift vessel that is capable of use as an offshore facility. The definition is important for the purpose of allocating liability between the responsible party for a MODU and a lessee.... With respect to an offshore facility (other than a deepwater port or pipeline), the responsible party normally will be the lessee or permittee of the area in which the facility is located.... With respect to a MODU which is being used as an offshore facility *and* when the pollution originates on or above the surface of the water, the responsible party will be the owner and operator of the MODU." H.R. Rep. No. 101–242, pt. 2, at 53, 55 (1989) (emphasis added). The emphasized "and" implies that when a subsurface discharge occurs, the responsible party will be the lessee. *See also id.* at 57.

**11.** Under OPA, "oil" means "oil of any kind or in any form, including ... fuel oil...." 33 U.S.C. § 2701(23). At oral argument, Transocean's counsel stated that the DEEPWATER HORIZON could carry about 17,000 barrels of diesel.

a surface discharge, but shift excess liability to the lessee.

Furthermore, this interpretation is entirely consistent with the scheme established in OPA's limits of liability. OPA is rooted in economic theory—the parties benefitting the most from oil production and transportation are exposed to the greatest liability. *See Nat'l Shipping Co. v. Moran Mid–Atl. Corp.*, 924 F.Supp. 1436, 1447 n. 6 (E.D.Va.1996).[12] Thus, the limit of liability for a small vessel is much lower than that of a large oil tanker. *See* 33 U.S.C. § 2704(a). Similarly, when it comes to the massive profits that may be made from an offshore facility, as well as the "prodigious and seemingly unlimited quantities of crude oil"[13] contained therein, OPA imposes *unlimited* liability on the lessee or permittee for removal costs and a potential limit of $75 million for other damages. 33 U.S.C. § 2704(a)(3). By contrast, the MODU's limit of liability is based on its gross tonnage, like other vessels. Given the difference between these liability limits (or lack thereof, in the case of the offshore facility and removal costs),

it appears that Congress envisioned that the lessee or permittee would bear the liability of this massive discharge.

There is perhaps a question as to whether Transocean would be liable to the Government for removal costs, but not damages, under Section 1004(c)(3) of OPA. That Section states:

> Notwithstanding the limitations established under subsection (a) of this section and the defenses of section 2703 of this title, *all removal costs* incurred by the United States Government or any State or local official or agency in connection with a discharge or substantial threat of a discharge of oil from any Outer Continental Shelf facility[14] or a vessel carrying oil as cargo from such a facility shall be borne by the *owner or operator* of such facility or vessel.

33 U.S.C. § 2704(c)(3) (emphasis added). Curiously, this Section does not use "responsible party" to assign responsibility, instead referring to the "owner or operator."[15] However, the parties do not address this Section outside of a passing

---

**12.** As explained by that court:

The congressional decision to limit a vessel owner's liability under OPA is firmly rooted in economic theory. Under the statute, the owner of a large vessel, like the M/V SAUDI DIRIYAH, is exposed to much greater liability than the owner of small vessel, like the HARRIET MORAN. *See* 33 U.S.C. § 2704(a). This scheme places the greatest exposure upon those who are in a position to obtain the most benefit from maritime commerce. Certainly, the owners of a large cargo vessel receive a greater benefit from the vessel's activity in this area than the owners of the tug boat which assists with the cargo vessel's docking procedure. The owners of large vessels, therefore, are in a better position to insure against an oil spill or to absorb the cost of a spill and pass the cost on to their customers. By placing the greatest risks of operating a vessel in the navigable waters of the United States upon those who receive the greatest benefits from doing so, the statute's liability

scheme allows the costs associated with oil spills to be spread among all those who benefit from maritime commerce, including those who consume products which are shipped from overseas.

*Moran Mid–Atl. Corp.*, 924 F.Supp. at 1447 n. 6.

**13.** S.Rep. No. 101–94, at 28 (1989), *reprinted in* 1990 U.S.C.C.A.N. 722, 748 (additional comments of Senator Chaffee, et al.)

**14.** "[T]he term "Outer Continental Shelf facility" means an offshore facility which is located, in whole or in part, on the Outer Continental Shelf and is or was used for one or more of the following purposes: exploring for, drilling for, producing, storing, handling, transferring, processing, or transporting oil produced from the Outer Continental Shelf." 33 U.S.C. § 2701(25).

**15.** A review of the legislative history reveals that this language anomaly may be due to the

reference in a footnote in the Government's brief. (U.S. Reply, p. 16 n. 15, Rec. Doc. 5214 at 24 n. 15). Accordingly, the Court does not address this issue here, but notes that it may be an open question.

The parties raise three other issues relative to OPA. First is whether liability under OPA is divisible or joint and several. The second issue pertains to OPA's liability cap. Third is whether the Government is entitled to a declaratory judgment for removal costs and damages.

■ As to the first issue, previous courts held that liability under OPA is joint and several when there is more than one responsible party. *See In re Settoon Towing, LLC*, 722 F.Supp.2d 710, 714 (E.D.La.2010); *United States v. Bodenger*, No. 03–272, 2003 WL 22228517 (E.D.La. Sept. 25, 2003). Although the words "joint and several" do not appear in OPA, OPA defines "liable" and "liability" as "the standard of liability which obtains under sec-

tion 1321 of this title [Section 311 of the CWA]." 33 U.S.C. § 2701(17). Liability under Section 311, in turn, "has been determined repeatedly to be strict, joint and several." H.R.Rep. No. 101–653, at 2 (1990) (Conf. Rep.), *reprinted in* 1990 U.S.C.C.A.N. 779, 780; *see, e.g., United States v. M/V Big Sam*, 681 F.2d 432, 439 (5th Cir.1982). The Court finds *Burlington Northern & Santa Fe Railway Co. v. United States*, 556 U.S. 599, 129 S.Ct. 1870, 173 L.Ed.2d 812 (2009), which interpreted a different act, unpersuasive.[16] Therefore, as to the subsurface discharge of oil, the Court finds liability under OPA is joint and several.

■ As to the second issue, the Government seeks a ruling that BP and Anadarko are liable without limit under OPA.[17] OPA's limits of liability do not apply if, *inter alia*,

the incident[18] was proximately caused by ... the violation of an applicable

---

fact that this provision was adopted directly from the Senate bill, S. 686, which used "owner or operator" instead of "responsible party" to affix liability. *See* H.R. Rep. No. 101–653, at 7 (1990) (Conf. Rep.), *reprinted in* 1990 U.S.C.C.A.N. 779, 785; S. 686 101st Cong. § 102(c)(3) (passed by Senate Aug. 4, 1989). The Senate bill also defined "owner or operator" to mean "lessee or permittee" when oil discharged below the surface of the water from a MODU being used as an Outer Continental Shelf facility. Of course, this is different from the definition of "owner or operator" that was enacted in OPA:

"owner or operator"—
(A) means—
(i) in the case of a vessel, any person owning, operating, or chartering by demise, the vessel;
(ii) in the case of an ... offshore facility, any person owning or operating such facility. ..."

33 U.S.C. § 2701(26). As explained in the main text, however, the Court need not address the effect of this language.

16. At issue in *Burlington* was the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"). That decision

relied on *United States v. Chem–Dyne Corp.*, 572 F.Supp. 802 (D.Ohio 1983). *Chem–Dyne*, in turn, noted that liability under the CWA was joint and several, but concluded that blanket application of the CWA's liability standard to CERCLA was inappropriate given that legislative history revealed Congress did not want to mandate joint and several liability. By contrast, OPA's legislative history makes explicit Congress' decision to apply the CWA's standard of joint and several liability to OPA.

17. BP has waived its liability cap, but opposes the Government's motion "to ensure that BP is not unfairly tainted with regulatory violations before the Phase 1 trial even begins." (BP Opp'n, p. 11, Rec. Doc. 5124 at 17).

18. " '[I]ncident' means any occurrence or series of occurrences having the same origin, involving one or more vessels, facilities, or any combination thereof, resulting in the discharge or substantial threat of discharge of oil." 33 U.S.C. § 2701(14).

Federal safety, construction, or operating regulation by the responsible party, an agent or employee of the responsible party, or a person acting pursuant to a contractual relationship with the responsible party ...

33 U.S.C. § 2704(c)(1)(B). The United States focuses on two regulations.[19] First, it claims there was a violation of the regulation requiring lessees to case and cement their wells, and such cementing programs must "Prevent the direct or indirect release of fluids from any stratum through the wellbore into offshore waters...." 30 C.F.R. § 250.420(a)(2). The Government contends that it is undisputed that the cement pumped into the Macondo Well did not prevent the release of fluids from the formation through the wellbore and into offshore waters. However, this regulation would tend to write out OPA's requirement that the violation of the regulation be a "proximate cause" of the incident, as this regulation is essentially coextensive with a regulatory prohibition on oil spills. Contrast this regulation with a hypothetical one that required a party to use a specific type of cement. If that cement was not used, and that noncompliance proximately caused the oil spill, then it would be appropriate to remove OPA's limit. The regulation relied upon by the Government, however, is not the type that would remove OPA's liability cap.

The Government's second proposed regulation states, "The lessee shall not create conditions that will pose unreasonable risk to public health, life, property, aquatic life, wildlife, recreation, navigation, commercial fishing, or other uses of the ocean." 30 C.F.R. § 250.300(a). The Government asserts that it is beyond dispute that the blowout was a condition created by BP and its co-lessees that posed an "unreasonable risk" to human life, as eleven men died. This argument fails for similar reasons. Identifying what caused the blowout is exactly what is required to determine whether any conditions on the rig were unreasonable or not.

■ The final issue concerns declaratory judgment. OPA states:

An action for recovery of removal costs referred to in section 2702(b)(1) of this title must be commenced within 3 years after completion of the removal action. In any such action described in this subsection, the court *shall* enter a declaratory judgment on liability for removal costs or damages that will be binding on any subsequent action or actions to recover further removal costs or damages.

33 U.S.C. § 2717(f)(2) (emphasis added). Congress' directive is clear. Having determined that BP and Anadarko are liable as "responsible parties" under OPA for the subsurface discharge of oil, the Government is entitled to declaratory judgment on this issue. Of course, there may be issues regarding quantum in subsequent actions, but the issue of liability is settled with regard to these two entities.

To conclude, because the DEEPWATER HORIZON, a MODU, was being used as an offshore facility at the time of the incident, BP and Anadarko, co-lessees of the area in which the offshore facility was located, are responsible parties with regard to the discharge of oil that occurred beneath the surface of the water.[20] Trans-

---

**19.** The Government contends many other regulations have been violated, but claims these two are appropriate for summary judgment because they are strict liability provisions that do not turn on material facts in dispute.

**20.** It should be noted that, although OPA generally treats a MODU as an offshore facility when it is used as such, this does not imply

that the DEEPWATER HORIZON was not a "vessel" for other purposes under general maritime law or that admiralty jurisdiction is not present. OPA's scheme merely establishes who will be liable for oil pollution under that Act; it expressly states that it does not affect maritime law or jurisdiction. 33 U.S.C. § 2751; *see also* H.R. Rep. No. 101–

756

ocean, as owner/operator of the MODU, is not a responsible party under OPA for the discharge that occurred beneath the surface of the water (though it may be liable for removal costs under Section 1004(c)(3)). Liability for OPA removal costs and damages is joint and several vis-à-vis BP and Anadarko and the subsurface discharge. The Government is not entitled to summary judgment on the issue of whether liability is unlimited under OPA. The Government is entitled to a declaratory judgment against BP and Anadarko. This Order does not address liability regarding any surface discharge that may have occurred, see note 4, supra, nor does it address liability under OPA Section 1004(c)(3), 33 U.S.C. § 2704(c)(3).

## C. The Clean Water Act

■ Section 311(b)(3) of the CWA prohibits the "discharge of oil ... (i) into or upon the navigable waters of the United States, adjoining shorelines, or into or upon the waters of the contiguous zone, or (ii) in connection with activities under the Outer Continental Shelf Lands Act [OCS-LA] ... in such quantities as may be harmful[21]...." 33 U.S.C. § 1321(b)(3). Where Section 311(b)(3) is violated, Section 311(b)(7) imposes a civil penalty:

Any person who is the owner, operator, or person in charge of any vessel, onshore facility, or offshore facility from which oil or a hazardous substance is discharged in violation of paragraph (3), shall be subject to a civil penalty in an amount up to $25,000 per day of violation or an amount up to $1,000[22] per barrel of oil or unit of reportable quantity of hazardous substances discharged.

33 U.S.C. § 1321(b)(7)(A). Thus, to establish liability for civil penalties under CWA Section 311(b)(7), the Government must show that each Defendant is (1) an "owner, operator, or person in charge of" (2) a "vessel ... or offshore facility" (3) "from which oil ... discharged" (4) in a harmful quantity (5) into or upon covered waters or "in connection with activities under [OCS-LA]." There is no dispute that elements (4) and (5) are met.

Although civil penalties existed under Section 311 before OPA was enacted, OPA amended Section 311 to, inter alia, increase the amounts of these penalties. OPA § 4301, Pub. L. No. 101–380, 104 Stat. 484, 533–37 (1990); see also H.R.Rep. No. 101–653, at 51–52 (1990) (Conf. Rep.), reprinted in 1990 U.S.C.C.A.N. 779, 831–33. However, the amendments did not incorporate the terms "responsible party"

---

653, at 58 (1990) (Conf. Rep.), reprinted in 1990 U.S.C.C.A.N. 779, 838 ("Section 6001 of the House bill clarifies that the House bill does not affect admiralty and maritime law or the jurisdiction of the District Courts of the United States with respect to civil actions under admiralty and maritime jurisdiction.... The Conference substitute adopts the House provision with respect to admiralty and maritime laws.... It is not the intent of the Conferees to change the jurisdiction in incidents that are within the admiralty and maritime laws of the United States. The Conferees wish to promote uniformity regarding these laws."). Therefore, nothing in this Order affects the Court's previous holdings regarding admiralty jurisdiction, etc. (See Order and Reasons as to Mot. to Dismiss the B1

Mstr. Cmplt., Rec. Doc. 3830 at 7–8, 808 F.Supp.2d 943 (E.D.La.2011)).

21. A discharge is "harmful" if it "cause[s] a film or sheen or discoloration of the surface of the water or adjoining shorelines or cause[s] a sludge or emulsion to be deposited beneath the surface of the water or upon adjoining shorelines." 40 C.F.R. § 110.3(b); Chevron, U.S.A., Inc. v. Yost, 919 F.2d 27, 30 (5th Cir.1990).

22. Federal regulations increased this amount to $1,100 per barrel. 33 C.F.R. § 27.3; 40 C.F.R. § 19.4. The maximum penal amount is increased in the event of gross negligence or willful misconduct. 33 U.S.C. § 1321(b)(7)(D).

or "MODU" into the CWA. Thus, the text of the CWA still imposes liability on the "owner, operator, or person in charge of any vessel ... or offshore facility from which oil ... is discharged." "Owner or operator" is defined in Section 311(a) as:

(A) in the case of a vessel, any person owning, operating, or chartering by demise, such vessel, and

(B) in the case of an ... offshore facility, any person owning or operating such ... offshore facility. . . .

33 U.S.C. § 1321(a)(6). "Person in charge" is not defined. The CWA's definition of "vessel" and "offshore facility" is the same as OPA's:

"vessel" means every description of watercraft or other artificial contrivance used, or capable of being used, as a means of transportation on water other than a public vessel;

. . .

"offshore facility" means any facility of any kind located in, on, or under, any of the navigable waters of the United States, ... other than a vessel or a public vessel;

33 U.S.C. § 1321(a)(3), (11). Finally, the CWA's definition of "discharge" is similar to OPA's:

"discharge" includes, but is not limited to, any spilling, leaking, pumping, pouring, emitting, emptying or dumping. . . .

33 U.S.C. § 1321(a)(2).[23]

Similar to its arguments regarding OPA, the United States contends that oil discharged from both the Macondo Well[24] and the DEEPWATER HORIZON; therefore, BP, Anadarko, and Transocean are each liable for per barrel civil penalties under Section 311(b)(7). However, Anadarko[25] relies on the phrase "other than a vessel" in the definition of "offshore facility," as meaning that "vessel" and "offshore facility" are mutually exclusive terms. Thus, Anadarko contends that oil could not discharge from both the vessel and the offshore facility. Furthermore, Anadarko interprets the phrase "from which oil ... discharged," as meaning the point where oil actually entered the marine environment. Because oil passed through the BOP and broken riser immediately before entering Gulf, Anadarko contends that oil discharged "from" the DEEPWATER HORIZON, a vessel, and not from the Macondo Well, an offshore facility. Transocean, on the other hand, interprets "from which oil ... discharged" as referring to the origin or source of the discharge, which is the place where the uncontrolled movement of oil began, not some conduit through which oil momentarily passed. Thus, Transocean argues that oil discharged "from" the Macondo Well and not the DEEPWATER HORIZON.

The CWA does not define "from," and its definition of "discharge" is of little help. While there appear to be no cases addressing this exact issue, *Peconic Baykeeper, Inc. v. Suffolk County,* 600 F.3d 180 (2d Cir.2010), provides some guidance. There a citizen suit was brought under the CWA against the owner/operator of trucks and helicopters that sprayed pesticides. The district court held that because the vehicles' spray applicators discharged pesticides into the air, and not directly into water, the vehicles were not "point

---

**23.** *Cf.* 33 U.S.C. § 2701(7) (" 'discharge' means any emission (other than natural seepage), intentional or unintentional, and includes, but is not limited to, spilling, leaking, pumping, pouring, emitting, emptying, or dumping").

**24.** The parties do not dispute, and the Court finds, that the Macondo Well was an "offshore facility" for purposes of the CWA.

**25.** BP merely adopts Anadarko's arguments regarding the CWA. For convenience, here BP and Anadarko will be referred to collectively as "Anadarko."

sources" under the CWA, and therefore the defendant's spraying did not violate the prohibition against the discharge of pollutants into navigable waters in CWA Section 301, 33 U.S.C. § 1311. The Second Circuit reversed, noting that "point source," as that term is used to define "discharge of a pollutant,"[26] means " 'any discernable, confined and discrete conveyance, including but not limited to any . . . container, rolling stock . . . or vessel or other floating craft, *from* which pollutants are or may be discharged.' " *Id.* at 188 (citing 33 U.S.C. § 1362(14); emphasis added). The court further explained, "The word 'from' " is defined 'to indicate a starting point,' and also denotes the 'source or original or moving force of something. . . .' " *Id.* at 188–89 (quoting Webster's Third International Dictionary Unabridged 913 (2002)). Thus, the Second Circuit concluded the district court erred because the pesticides discharged "from" the spray applicators attached to the defendant's trucks and helicopters, not "from" the air.

The language *Peconic* interpreted is similar to the relevant portion of Section 311(b)(7):

> "any discernible, confined and discrete conveyance . . . *from which* pollutants are or may *be discharged,*" (*Peconic* )
> "vessel . . . or offshore facility *from which* oil . . . *is discharged*" (Section 311(b)(7)).

Thus, *Peconic's* conclusion that "from" means "a starting point" or "source or original or moving force of something" indicates that "discharge" in Section 311(b)(7) does not necessarily mean the point where oil entered the marine environment. Rather, *Peconic* suggests that this discharge occurred where the uncontrolled movement of oil began, as contended by Transocean. Indeed, Section 311(a)'s definition of "discharge" suggests a broader interpretation than Anadarko would apply: " 'discharge' " *includes, but is not limited to,* any spilling, leaking, pumping, pouring, emitting, emptying or dumping . . . ." (emphasis added).

It is true that, for three months in 2010, images of oil gushing out of Transocean's broken riser saturated news media. Yet, few would conclude from these images that the flow of oil was controlled while in the Macondo Well, and only began its movement seaward in the riser or the BOP. In fact, it is undisputed that oil flowed uncontrollably even while the riser was still connected to the MODU.[27] Pressure within the earth drove hydrocarbons up the Macondo Well, through the BOP, and finally out the riser. Thus, the uncontrolled movement of oil began in the well. The riser and BOP, by contrast, were merely passive conduits through which oil flowed. For purposes of Section 311(b)(7), oil discharged from the Macondo Well.[28]

---

26. Section 301(a) states that "the *discharge of any pollutant* by any person shall be unlawful," except where done in compliance with a permit. 33 U.S.C. 1311(a) (emphasis added). "Discharge of a pollutant" is defined as "any addition of any pollutant to navigable waters from any *point source.*" 33 U.S.C. § 1362(12) (emphasis added). "Point source" is defined in the main text.

27. What is disputed is whether oil actually reached the surface of the water during this time, or was consumed in the fire on the DEEPWATER HORIZON. *See* note 4, *supra.*

28. It is important to note that the Court's interpretation of Section 311(b)(7) is not merely based on the source of the *oil,* but on the source of the *uncontrolled movement* of oil toward the marine environment. If the issue simply turned on the source of the oil, then an argument could be made that an owner of an offshore facility is liable for any oil spill involving oil produced from that facility, such as a spill from a third party's tank barge carrying the oil as its cargo.

Anadarko's argument is essentially based on fortuity. If, instead of the riser, the well head (a component of the Macondo Well) ruptured when the MODU sank, then Anadarko's interpretation would conclude that the discharge occurred from the offshore facility. Alternatively, when the capping stack used to stop the oil spill was placed on top of the BOP in July 2010, Anadarko's interpretation would conclude that the capping stack became the new point of discharge, since oil thereafter spewed out the capping stack for three days until it could be fully closed. Shifting the point of discharge, and thus liability, in this manner would be absurd when in all circumstances the uncontrolled movement of oil began in the Macondo Well.

Anadarko's interpretation also contradicts one of the purposes CWA penalties. The Fifth Circuit has stated that the civil penalty in Section 311(b)(6)—which is functionally similar to, albeit smaller than, a(b)(7) penalty—is designed to "place[ ] a major part of the financial burden for achieving and maintaining clean water upon those who would profit by the use of our navigable waters and adjacent areas, and who pollute same." *United States v. Coastal States Crude*, 643 F.2d 1125, 1128 (5th Cir.1981). The Seventh Circuit elaborated on this point in *United States v. Tex Tow, Inc.*, which held a tank barge operator liable for a CWA penalty even though the discharge was the fault of a third party:

> Tex–Tow was engaged in the type of enterprise which will inevitably cause pollution and on which Congress has determined to shift the cost of pollution [via Section 311(b)(6) ] when the additional element of an actual discharge is present. These two elements, actual pollution plus statistically foreseeable pollution attributable to a statutorily defined type of enterprise, together satisfy the requirement of cause in fact and legal cause.... An enterprise such as

Tex–Tow engaged in the transport of oil can foresee that spills will result despite all precautions and that some of these will result from the acts or omissions of third parties. Although a third party may be responsible for the immediate act or omission which "caused" the spill, Tex–Tow was engaged in the activity or enterprise which "caused" the spill. Congress had the power to make certain oil-related activities or enterprises the "cause" of the spill rather than the conduct of a third party. With respect to the civil penalty Congress has exercised this power.... Economically, it makes sense to place the cost of pollution on the enterprise ... which statistically will cause pollution and in fact does cause pollution.... This is the theory of cost "internalization," under which the social costs of an enterprise are attributed to that enterprise.

589 F.2d 1310, 1314–15 & n. 11 (7th Cir. 1978) (citations and some footnotes omitted). Like Tex–Tow, Anadarko and BP were the ones directly engaged in the enterprise which caused the spill. They were the mineral lessees, they owned the well, and they stood to profit directly from the oil it produced. Thus, Congress intended that the cost of pollution would be borne by these parties. By contrast, Transocean was involved in the "enterprise" by virtue of its contract with BP. Transocean was paid charter hire by BP; it did not stand to profit directly from the oil.

Furthermore, this interpretation is also consistent with OPA, which was similarly designed to impose the greatest liability upon those who would benefit the most from oil production and transportation (discussed above). Congress intended that OPA would "build upon section 311 of the Clean Water Act to create a single Federal law providing cleanup authority, penalties, and liability for oil pollution."

S.Rep. No. 101–94, at 9 (1989), *reprinted in* 1990 U.S.C.C.A.N. 722, 730; *see also* H.R.Rep. No. 101–242, pt. 2, at 31 (1989). Thus, it is logical that the responsible parties for a discharge under OPA would also be liable for penalties under the CWA. It is perhaps no accident, then, that the Conference Report on OPA referred to "responsible parties" when it discussed CWA penalties, even though that term does not appear in Section 311(b)(7):

> Civil penalties should serve primarily as an additional incentive to minimize and eliminate human error and thereby reduce the number and seriousness of oil spills. There are strong operational and economic incentives within the Conference substitute that should encourage *responsible parties* to prevent oil spills. In determining the amount of a civil penalty, particular weight should be given to the rapidity and effectiveness of the response actions by the *responsible party.* (emphasis added).

H.R.Rep. No. 101–653, at 52 (1990) (Conf. Rep.), *reprinted in* 1990 U.S.C.C.A.N. 779, 833.[29]

Finally, the Court's interpretation is also consistent with the CWA's definition of "worst case discharge," which is used to describe the response plans required by the CWA. *See* 33 U.S.C. § 1321(a)(24). In the case of a vessel, "worst case discharge" refers to the discharge of the vessel's "entire cargo." In the context of an offshore facility, the phrase means the "the largest foreseeable discharge." Using "cargo" to describe the worst case discharge from a vessel implies that Congress did not intend the owner or operator of the DEEPWATER HORIZON to be primarily liable under the CWA for this incident, because the DEEPWATER HORIZON was not intended to carry this vast amount of oil as is cargo. Conversely, the vague nature of the phrase, "largest foreseeable discharge," contemplates the vast quantities of oil that discharged in this incident. Thus, if Congress envisioned that the owner of the offshore facility would have to respond to an oil spill such as this one, then it is logical that they would also be the party upon whom the civil penalty is imposed.

The court is not persuaded by the cases relied upon by Anadarko. For example, Anadarko cites *United States v. Chotin Transportation, Inc.,* where a tank barge was bunkering at an onshore facility, and fuel overflowed the tank and spilled into the river. 649 F.Supp. 356 (S.D.Ohio 1986). As a result, the barge was assessed a $1,500 penalty under Section 311(b)(6). Relying on this and other, similar cases,[30] Anadarko analogizes this incident to a transfer of oil from a facility to a vessel, and then a subsequent discharge from a vessel. However, this matter does not

---

**29.** Along these lines, there is perhaps an argument that the CWA should treat a MODU as an offshore facility when it is drilling, etc., for oil, notwithstanding the fact that the term "MODU" does not appear in Section 311 of the CWA. OPA copied the definition of "offshore facility" directly from the CWA. *Compare* 33 U.S.C. § 1321(a)(11) *with* 33 U.S.C. § 2701(22). This indicates that the term should be treated identically under the two Acts; what is an offshore facility under the CWA is also an offshore facility under OPA, and vice versa. *See* H.R. Rep. No. 101–653, at 2 (1990) (Conf. Rep.), reprinted in 1990 U.S.C.C.A.N. 779, 779 ("In each case, these [CWA] definitions shall have the same meaning in this legislation [OPA] as they do under the [CWA] and shall be interpreted accordingly."). Under this reasoning, even if the discharge occurred "from" the broken riser, the discharge would nevertheless be "from" the offshore facility.

**30.** *Int'l Marine Carriers v. Oil Spill Liab. Tr. Fund,* 903 F.Supp. 1097 (S.D.Tex.1994) (applying OPA); *United States v. The Catherine,* 116 F.Supp. 668 (D.Md.1953) (applying Oil Pollution Act of 1924); *ACC Chem. Co. v. Halliburton Co.,* 932 F.Supp. 233 (S.D.Iowa 1995) (applying CERCLA).

involve a vessel that voluntarily received oil intended to be carried as its cargo or used as its fuel. Instead, the DEEPWATER HORIZON was preparing to temporarily **abandon** the well at the time of the blowout. The cases cited by Anadarko are simply inapplicable here.

For the reasons stated above, the Court holds that, for purposes of CWA Section 311(b)(7) and with respect to the subsurface discharge, oil discharged from the Macondo Well, an offshore facility. Conversely, the Court finds that the subsurface discharge was not from the vessel, the DEEPWATER HORIZON.[31] Furthermore, because it is undisputed that BP and Anadarko were owners of the offshore facility, BP and Anadarko are liable for civil penalties under the Section 311(b)(7).[32] The Court need not address whether BP and Anadarko were also "operators" or "persons in charge" of the offshore facility.

As to Transocean, even though the discharge was not from the vessel, a question remains as to whether it would be an "operator" of the offshore facility. The CWA's definition of "operator" provides little guidance: "'owner or operator' means ... any person owning or operating such ... offshore facility...." 33 U.S.C. § 1321(a)(6). However, the Supreme Court described an "operator" under the Comprehensive Environmental Response, Compensation and Liability Act ["CERCLA"], 42 U.S.C. § 9601(20)(a),[33] as one who:

> must manage, direct, or conduct operations specifically related to pollution, that is, operations having to do with the leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations.

*United States v. Bestfoods,* 524 U.S. 51, 66–67, 118 S.Ct. 1876, 141 L.Ed.2d 43 (1998).[34] There are disputed facts as to whether Transocean meets this definition. Accordingly, the Court cannot resolve this issue on summary judgment.

To conclude, BP and Anadarko are liable for civil penalties under Section 311(b)(7) of the CWA, 33 U.S.C. § 1321(b)(7), because they are both owners of the offshore facility from which oil discharged. In this respect, the United States' Motion for Partial Summary Judgment is granted and Anadarko's Motion is denied. Because Transocean might be liable under Section 311(b)(7) as an "operator" or "person in charge" of the offshore facility, Transocean's Motion for Partial Summary Judgment is denied.

**31.** Again, the Court does not address here any surface discharge that may have occurred. *See* note 4, *supra.*

**32.** At oral argument, the Government asserted that where multiple parties are liable for a CWA penalty, a separate penalty is imposed on each defendant, rather than the defendants sharing liability for a single penalty. The Government also asserted that the penalty could not be shifted to a third party by equitable means. These issues were not addressed in the parties' briefs, other than the Government's passing reference to "absolute" liability, which it then contradicted by stating "CWA Section 311's standard of liability has been determined repeatedly to be strict, joint, and several." (U.S. Memo in Supp., p. 17, Rec. Doc. 4820–5 at 44 (quotations omitted)).

Consequently, the Court does not address these issues here.

**33.** The definition of "operator" provided in CERCLA is identical to the CWA's definition: "The term 'owner or operator' means ... in the case of an ... offshore facility, any person ... operating such facility...." 42 U.S.C. § 9601(20)(a).

**34.** *Accord Beartooth Alliance v. Crown Butte Mines,* 904 F.Supp. 1168 (D.Mont.1995) (interpreting Section 311) ("An entity is an operator of a facility where it has the power or capacity to (i) make timely discovery of discharges, (ii) direct the activities of persons who control the mechanisms causing the pollution, and (iii) prevent and abate damage." (citations omitted)).

.

**762**

### IV. CONCLUSION

**IT IS ORDERED** that the United States' Motion for Partial Summary Judgment (Rec. Doc. 4836) is **GRANTED IN PART** and **DENIED IN PART,** Anadarko's Motion for Partial Summary Judgment (Rec. Doc. 5113) is **DENIED,** and Transocean's Motion for Partial Summary Judgment (Rec. Doc. 5103) is **GRANTED IN PART** and **DENIED IN PART,** as set forth above.